IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TRAVELERS PROPERTY CASUALTY | : | CIVIL ACTION |
| COMPANY OF AMERICA | : | |
| | : | No. 11-565 |
| v. | : | |
| | : | |
| CHUBB CUSTOM INSURANCE | : | |
| COMPANY, et al. | : | |

## MEMORANDUM

**Juan R. Sánchez, J.**                                                                   **March 30, 2012**

Plaintiff Travelers Property Casualty Company of America (Travelers) seeks a declaration

pursuant to 28 U.S.C. §§ 2201 and 2202 that it has no duty to defend or indemnify its insureds,

Defendants The Clemens Family Corporation (CFC) and its subsidiary, Country View Family Farms,

LLC (CVFF) (together, the Clemens Defendants), in a lawsuit concerning an Indiana pig farm

managed by CVFF. Zurich American Insurance Company (Zurich), also named as a Defendant, has

asserted a cross-claim against the Clemens Defendants seeking a similar declaration with respect to

a policy it issued to the Clemens Defendants. Both Travelers and Zurich now move for summary

judgment pursuant to Federal Rule of Civil Procedure 56(a). Because this Court finds coverage for

the underlying lawsuit is barred by the pollution exclusion contained in both Travelers' and Zurich's

general liability policies, summary judgment will be granted in favor of Travelers and Zurich and

against the Clemens Defendants.

## FACTS[1]

Travelers is an insurer incorporated in Connecticut with its principal place of business in

---

[1] "On a motion for summary judgment, a district court must view the facts in the light most favorable
to the non-moving party and must make all reasonable inferences in that party's favor." *Hugh v.
Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

Hartford, Connecticut.  Zurich is an insurer incorporated in New York with its principal place of business in Schaumburg, Illinois.  Both Travelers and Zurich are licensed to transact business in Pennsylvania.

CFC, a Pennsylvania corporation with its principal place of business in Hatfield, Pennsylvania, engages in food processing, farming, and real estate activities.  CFC conducts its business through two wholly owned subsidiaries:  Clemens Development, LLC and Clemens Food Group, LLC, both Pennsylvania corporations with their principal places of business in Hatfield, Pennsylvania.  These two companies own 41 subsidiaries, 39 of which are Pennsylvania corporations or limited liability companies with principal places of business in Pennsylvania.  The remaining two entities are holding companies located in Delaware.

One of the 41 subsidiaries is CVFF, a Pennsylvania limited liability company with its principal place of business in Middletown, Pennsylvania, that manages pig-raising operations.  CVFF has 130 such operations in Pennsylvania, fewer than 10 in Indiana, and fewer than 5 in all other states.

One of CVFF's Indiana pig-raising operations is the Sky View Sow Unit (Sky View), a 2,800-sow production facility at which female pigs give birth to and raise baby pigs.  CVFF rents Sky View from Don Leis.  Pig-raising operations at Sky View began on April 2, 2007, when pigs first populated the facility.  At the facility, the pigs' excrement is collected in a large, cement pit directly beneath the structure where the pigs are housed.  Excrement and other materials that drain from the housing structure into the pit are held in the pit until removed through a drag line and deposited on nearby fields as fertilizer.  These tasks are performed exclusively by Leis and his company, Donbar Investments, LLC.

2

On December 21, 2009, Jimmy Cook and several fellow neighbors of Sky View brought suit against the Clemens Defendants, Leis, and others in the United States District Court for the Southern District of Indiana, alleging the sow facility produces "harmful and ill-smelling odors, hazardous substances and contaminated wastewater" that escape onto their properties causing personal injury and property damage. Zurich's Mot. for Summ. J. Ex. A, at 7 (hereinafter Cook Complaint). The lawsuit (hereinafter the Cook Action) asserts claims against the Clemens Defendants for negligence, temporary nuisance, and respondeat superior liability. The Cook Complaint asserts the pig facility—specifically "the deep pit in which hog urine and feces, afterbirth remnants, as well as other hazardous substances and materials are stored;[2] the piping system and trucks used to extract the waste from the deep pit and transport it to land application fields; the land application fields where Defendants dispose of the millions of gallons of hog waste that they generate every year," along with the resulting "contaminated runoff" and the facility's "method of disposal of dead hogs"—produces "offensive and noxious odors" which "impair Plaintiffs' use and quiet enjoyment of their properties" and causes Plaintiffs to "experience 'sudden onset' physical manifestations" including nausea, vomiting, headaches, breathing difficulties, burning and irritated eyes, noses, and throats, and aggravation of other medical conditions. *Id.* at 2, 6, 8.

The Clemens Defendants have demanded Travelers and Zurich provide defense and indemnification in the Cook Action pursuant to the general commercial liability policies these insurers issued to CFC. The Travelers Policy was in effect from May 1, 2006, through May 1, 2007. The Policy was negotiated by Lockton Companies (Lockton)—a broker operating in Kansas City,

---

[2] According to the Cook Complaint, such hazardous substances include "nitrate, hydrogen sulfide, ammonia, sulfate, [and] afterbirth remnants." *Id.* at 6.

3

Missouri—on behalf of CFC.  CFC paid all premiums on the Policy from its Pennsylvania

headquarters.  The Travelers Policy provides insurance coverage to CFC and its subsidiaries for

liability for property damage and bodily harm that occurs during the policy period.[3]  It excludes

coverage, however, for harm arising from the insured's release or discharge of a pollutant.[4]  The

Policy defines "pollutant" as "any solid, liquid, gaseous or thermal irritant or contaminant, including

---

[3] The Travelers Policy defines "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time," and contains an endorsement amending the definition to include "mental anguish, mental injury, shock, fright, disability, humiliation, sickness or disease sustained by a person, including death resulting from any of these at any time."  Blackman Decl. Ex. 3, at CFC0140, CFC0171 (hereinafter Travelers Policy).  The Policy defines "property damage" as "(a) Physical injury to tangible property, including all resulting loss of use of that property," or "(b) Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it." *Id.* at CFC0197.

[4] The "pollution exclusion" excludes coverage for:

> (1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":
>> (a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to or managed by, any insured. . . .
>> (b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;
>> (c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or
>> (d) Which arises out of "your work" or the work or operations of any contractors or subcontractors who work or worked directly or indirectly on your behalf; or
>> (e) Which arises out of "your product".
> (2) Any loss, cost or expenses arising out of any:
>> (a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants."

Travelers Policy, at CFC025.

smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be

recycled, reconditioned or reclaimed."  Travelers Policy, at CFC0153.  The Travelers Policy also

contains an Indiana-specific endorsement that amends the definition of pollutant to include "any such

irritant or contaminant whether or not it has or had any function in your business, operations,

premises, site or location, including without limitation, gasoline, fuels, lubricants and their respective

additives, petroleum or petroleum derivatives."  *Id.* at CFC0203.

The Zurich Policies are similar to the Travelers Policy.  Zurich issued an initial general

commercial liability policy to CFC for the policy period May 1, 2007, through May 1, 2008.  This

Zurich Policy was renewed for the terms May 1, 2008, to May 1, 2009, and May 1, 2009, to May 1,

2010.  Like the Travelers Policy, the Zurich Policies were also brokered by Lockton, which took its

direction from CFC's headquarters in Pennsylvania.  CFC paid all premiums on the Zurich Policies

from its headquarters.  The Zurich Policies provide insurance coverage to CFC and its subsidiaries

for liability for property damage and bodily harm,[5] and also include a pollution exclusion nearly

identical to the exclusion in the Travelers Policy.[6]  The definition of "pollutant" in the Zurich

---

[5] The Zurich Policies define "bodily injury" as "bodily injury, sickness or disease sustained by a
person.  This includes mental anguish, mental injury, shock, fright or death resulting from bodily
injury, sickness or disease." Zurich's Mot. for Summ. J. Ex. E, Zurich 2007-2008 Policy (hereinafter
Zurich Policy).  "Property damage" is defined as "(a) Physical injury to tangible property, including
all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time
of the physical injury that caused it; or (b) Loss of the use of tangible property that is not physically
injured.  All such loss of the use shall be deemed to occur at the time of the 'occurrence' that caused
it." *Id.*

[6] The pollution exclusion in the Zurich Policies excludes coverage for:

> (1) "Bodily injury" or "property damage" which would not have occurred in whole
> or part but for the actual, alleged or threatened discharge, dispersal, seepage,
> migration, release or escape of "pollutants" at any time. . . .
> (2) Any loss, cost or expense arising out of any:

Policies is identical to the definition in the Travelers Policy. The renewed Zurich Policies, but not the initial May 1, 2007, to May 1, 2008, policy, include Indiana-specific endorsements regarding the definition of the term "pollutant" nearly identical to the endorsement in the Travelers Policy.

The instant action was initiated when Travelers filed suit seeking a declaration it did not owe a duty to defend or indemnify the Clemens Defendants in the Cook Action. Travelers named Zurich as a Defendant, along with two other insurers who have since been voluntarily dismissed. Zurich filed a cross-claim for a declaration it also did not owe a duty to defend or indemnify the Clemens Defendants in the Cook Action, and it filed a counterclaim seeking contribution and indemnification from Travelers if Zurich is forced to defend the Clemens Defendants in the underlying suit. Zurich has been defending the Clemens Defendants in the Cook Action under a reservation of rights. Travelers and Zurich now move for summary judgment on their claims against the Clemens Defendants pursuant to the pollution exclusion in their respective policies.[7]

---

> (a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants."

*Id.*

[7] Travelers also seeks summary judgment based on two additional grounds. First, Travelers argues a provision in the Policy excluding coverage to "Country View Family Farms, Inc." (CV Inc.) bars coverage for the Cook Action because CVFF is CV Inc. The Clemens Defendants dispute this contention and argue on January 26, 2007, CV Inc. merged into another CFC subsidiary, Pleasant Valley Foods LLC, which was a named insured under the Policy. They assert the surviving entity was Pleasant Valley Foods LLC, which then changed its name to CVFF; therefore, CVFF is a named insured. Second, Travelers argues if CVFF was in fact created in the merger, it is excluded from coverage because the Policy only covers those subsidiaries in which CFC maintained a majority interest on the date the Policy came into effect, a date which preceded the merger. Travelers also asserts it did not receive notice of the merger, as required under the Policy. The Clemens Defendants argue Pleasant Valley Foods LLC did not lose its status as a named insured simply because it changed its name to CVFF. They also dispute Travelers' contention it did not receive notice of the change in corporate structure. Viewing the facts in the light most favorable to the Clemens

**DISCUSSION**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material" facts are those facts "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

The Travelers and the Zurich Policies do not contain a choice of law provision, and the parties dispute whether Indiana or Pennsylvania law applies in this case. When a federal court is sitting in diversity, as is the case here, the choice of law rules of the forum state apply. *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 226 (3d Cir. 2007) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)). Pennsylvania applies a "flexible [choice of law] rule which permits analysis of the policies and interests underlying the particular issue before the court and directs courts to apply the law of the state with the most interest in the problem." *Specialty Surfaces Int'l, Inc. v. Cont'l Cas. Co.*, 609 F.3d 223, 229 (3d Cir. 2010) (quoting *Hammersmith*, 480 F.3d at 227 (internal quotation marks omitted)). In applying this rule to a contract case, the court must first determine if a true conflict exists. *Id.* at 230. If such a conflict exists, the court must then consider each state's contacts with the contract as set forth in the *Restatement (Second) of Conflict of Laws*,

---

Defendants, this Court cannot resolve these issues on the record before it. These issues need not be addressed, however, because this Court finds Travelers is entitled to relief pursuant to the pollution exclusion.

and "weigh the contacts on a qualitative scale according to their relation to the policies and interests underlying the relevant issue." *Specialty Surfaces*, 609 F.3d at 230 (quotation omitted).  Finally, the court must consider "the interests and policies that may be validly asserted by each jurisdiction." *Hammersmith*, 480 F.3d at 235 (quotation omitted).

Here, an "actual" conflict exists if Pennsylvania and Indiana law differ in their analysis of insurance policy pollution exclusions, and such difference will be a "true" conflict if "both jurisdictions' interests would be impaired by the application of the other's laws." *Id.* at 230 (citing *Cipolla v. Shaposka*, 267 A.2d 854, 856 (Pa. 1970)).  The Pennsylvania Superior Court has expressly declined to follow Indiana precedent concerning the application of pollution exclusions in a case where the alleged pollutant (gasoline) was the main source of potential liability for the insured (a gas station).  *Wagner v. Erie Ins. Co.*, 801 A.2d 1226, 1232-33 (Pa. Super. Ct. 2002) (declining to follow *American States Insurance Co. v. Kiger*, 662 N.E.2d 945, 948-49 (Ind. 1996)).  Moreover, in a decision issued just days ago, the Indiana Supreme Court held pollution exclusions that do not explicitly include the pollutant at issue are ambiguous because "practically every substance would qualify as a 'pollutant' under [the policy's] definition," and such exclusions therefore must be construed in favor of coverage.  *State Auto. Mut. Ins. Co. v. Flexdar, Inc.*, No. 49S02-1104-PL-199, 2012 WL 966052, at *3 (Ind. Mar. 22, 2012).  Pennsylvania courts, however, have consistently construed pollution exclusions to be unambiguous even when the pollutant at issue is not listed in the exclusion.  *See, e.g.*, *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999);  *Matcon Diamond, Inc. v. Penn Nat'l Ins. Co.*, 815 A.2d 1109, 1115 (Pa. Super. Ct. 2003);

*Wagner*, 801 A.2d at 1232-33.  An actual conflict therefore exists.[8]

This actual conflict is a true conflict because the interests of both Indiana and Pennsylvania would be impaired by application of the other state's laws.  Indiana has an interest in whether the potential liability in the Cook Action is covered because the harm is allegedly caused by a farm located in Indiana and suffered by Indiana residents and property.  *See Specialty Surfaces*, 609 F.3d at 232.  Pennsylvania also has an interest in having its law applied to an insurance policy issued by insurers licensed to do business in Pennsylvania to two Pennsylvania corporations that have their principal places of business in Pennsylvania.  *See id.*

Because a true conflict exists, this Court must next examine Indiana's and Pennsylvania's contacts with the Travelers and Zurich Policies under the *Restatement (Second) of Conflict of Laws*, "bearing in mind" this analysis is "'concerned with the contract of insurance' and not the underlying tort."  *Hammersmith*, 480 F.3d at 232-33 (quoting *McCabe v. Prudential Prop. & Cas. Ins. Co.*, 514 A.2d 582, 586 (Pa. Super. Ct. 1986)).  *Restatement* section 193 addresses casualty insurance policies and provides the applicable law is that of "the state which the parties understood was to be the principal location of the insured risk during the term of the policy."  *Restatement (Second) of Conflict of Laws* § 193.  Where the insured risk is located in multiple states, however, section 193 does not apply.  *Specialty Surfaces*, 609 F.3d at 233; *see also Hammersmith*, 480 F.3d at 233 ("[I]f the 'policy covers a group of risks that are scattered throughout two or more states,' the location of the risk has 'less significance' to the choice-of-law determination." (quoting *Restatement (Second)*

---

[8] Because there are no Indiana decisions applying a pollution exclusion to pig waste, it is not clear application of the recent standard set forth in *Flexdar* would result in a finding the exclusion is ambiguous in this case, given "waste" and "fumes" are two of the terms used to define pollutant in the policies.  Nevertheless, this Court will proceed with the choice of law analysis, recognizing the measurable difference between the Pennsylvania and Indiana standards.

*of Conflict of Laws* § 193 cmt. b)).  Here, the parties admit they understood the risks insured under the policies were located in multiple states.  Although the Clemens Defendants argue section 193 instructs courts to apply the law of the state in which the particular risk at issue is located in such circumstances, this interpretation was expressly rejected by the court in *Hammersmith*: "[s]ection 193 clearly reflects a 'preference that only one set of laws govern a given insurance contract, and a disapproval of the possibility that the laws of different jurisdictions might apply to different risks under the policy.'"  480 F.3d at 233 (quoting *United Brass Works, Inc. v. Am. Guar. & Liab. Ins. Co.*, 819 F. Supp. 465, 469 (W.D. Pa. 1992)).[9]

Because section 193 does not resolve the question, this Court must examine the contacts listed in *Restatement* section 188(2) to determine if Indiana or Pennsylvania "has the greater contacts with the contract at issue."  *Specialty Surfaces*, 609 F.3d at 233.  These factors, which "are to be evaluated according to their relative importance with respect to the particular issue," include: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties."  *Restatement (Second) of Conflict of Laws* § 188(2).

---

[9] The Clemens Defendants argue the Indiana-specific endorsements in the Travelers and Zurich Policies amending the language of the pollution exclusion mandate Indiana law be applied where the risk is in Indiana, based on *Restatement* section 193 comment f, and *Assicurazioni Generali, S.P.A. v. Clover*, 195 F.3d 161 (3d Cir. 1999).  Neither of these authorities supports their argument, however.  Comment f advises courts to interpret policies with regard to the law of the state in which the particular risk is located when the policy incorporates "special statutory forms," *Restatement (Second) of Conflict of Laws* § 193 cmt. f, and thus does not apply here because the Indiana endorsements are not special statutory forms.  Similarly, *Assicurazioni*, which held a state-required endorsement amounted to a choice of law clause, 195 F.3d at 164-65, does not apply here because the endorsements at issue are not required by Indiana law.

10

"An insurance contract is made in the state where it is delivered." *Hammersmith*, 480 F.3d at 233 (citing *Harry L. Sheinman & Sons v. Scranton Life Ins. Co.*, 125 F.2d 442, 444 (3d Cir. 1941)). The Travelers and the Zurich Policies were all brokered by Lockton on behalf of CFC. According to the testimony of the Lockton representative who brokered the policies, the policies were delivered to CFC at its headquarters in Hatfield, Pennsylvania. The Clemens Defendants assert the policies were in fact delivered to Lockton at its offices in Kansas City, Missouri; however, they do not offer any competent evidence to contradict the Lockton employee's testimony. In the absence of proof of the place of delivery, there is a presumption of delivery at the insured's residence. *Crawford v. Manhattan Life Ins. Co. of N.Y.*, 221 A.2d 877, 881 (Pa. Super. Ct. 1966). Even if the Clemens Defendants' assertion is true, however, and even if the Policies were deemed to have been delivered at Lockton's Missouri offices,[10] this factor would be neutral considering no party argues Missouri law should apply.

The Travelers Policy was negotiated by Travelers out of its Philadelphia branch office, and by Lockton working out of Missouri. It is unclear where Zurich performed its negotiations with Lockton. Lockton conferred with CFC from its offices in Missouri and in in-person meetings at CFC's headquarters in Pennsylvania. No negotiations took place in Indiana.

As to the place of performance, the Clemens Defendants performed under the contracts exclusively in Pennsylvania, as all premiums on the policies were paid out of CFC's headquarters in Hatfield. *See Specialty Surfaces*, 609 F.3d at 234 (holding insured performs in the state from which its premiums are paid). Zurich and Travelers, however, perform under their contracts where

---

[10] It is unclear whether, under Pennsylvania law, a contract sent from an insurer to an insured's broker, which forwards the contract to the insured, is considered delivered at the place of the broker or the insured.

11

they are required to defend the Clemens Defendants, including in Indiana.  *See id.*

The location of the subject matter of these policies "refers to the location of the insured risk."  *Hammersmith*, 480 F.3d at 234.  Where the insured risk lies in multiple states, as is the case here, this factor is neutral.  *Id.*; *see also Specialty Services*, 609 F.3d at 234.

As to the domicile, residence, place of incorporation, and place of business of the parties, this Court finds significant that the Clemens Defendants are both Pennsylvania corporations with their principal places of business in Pennsylvania.  CFC conducts its business through 41 subsidiaries, all but two of which are also incorporated under the laws of Pennsylvania and have principal places of business in Pennsylvania.  Furthermore, even CVFF's pig-raising operations are predominantly located in Pennsylvania, as CVFF has 130 such operations in Pennsylvania, fewer than 10 in Indiana, and fewer than 5 in other states.  Travelers is incorporated in Connecticut with its principal place of business in Connecticut, and Zurich is incorporated in New York with its principal place of business in Illinois.  Both insurers are licensed to do business in Pennsylvania and Indiana.

Next this Court must "weigh these contacts on a qualitative scale according to their relation to the policies and interests underlying the relevant issue on which there is a conflict—the coverage issue."  *Specialty Services*, 609 F.3d at 234 (quotation omitted).  Here, Pennsylvania has a significantly greater relationship to the Travelers and Zurich Policies than does Indiana, especially considering this Court is primarily "'concerned with the contract of insurance' and not the underlying tort."  *Hammersmith*, 480 F.3d at 232-33 (quoting *McCabe*, 514 A.2d at 586).  The Clemens Defendants are incorporated in Pennsylvania and maintain their principal places of business in this Commonwealth.  Key parts of the negotiations took place in Pennsylvania, with no negotiations

12

taking place in Indiana, and all the subject policies were made in Pennsylvania.[11]  Moreover, the vast majority of CVFF's pig production facilities, like the one in the Cook Action, are located in Pennsylvania.  The only contacts Indiana has with respect to the issue of coverage are the fewer than 10 pig production facilities in Indiana, including the one such facility that is the subject of the Cook Action.

In *Specialty Surfaces*, a factually similar case to this one, the Court of Appeals for the Third Circuit held "the state in which a claim is filed and [the insurer] is required to defend a lawsuit is not significantly related to the coverage question," and thus "the place of performance of any duty on the part of [the insurer] to defend the underlying lawsuit is entitled to relatively little weight."  609 F.3d at 235.[12]  There, the court held because the conflict concerned only how courts interpret the "intent of the parties when they allocated risks in the policy," and not some underlying government interest, "the place of contracting, the place of negotiation, and the parties' principal places of business are the most important contacts when determining which state's law should be applied." *Id.* at 234-35.  Here, Indiana courts are reluctant to apply pollution exclusions where the alleged pollutant is not expressly included in the provision because they find the overly broad definition of pollutant ambiguous and not a proper reflection of what the insured contracted for.  *See Flexdar*, 2012 WL 966052 at *2-3.  Pennsylvania courts, however, focus their inquiry on the specific alleged pollutant in the context of the relevant factual circumstances, rather than on the scope of the

---

[11]  Even in the event Pennsylvania law would view these contracts as delivered in Missouri, the qualitative balance would still tip heavily in favor of Pennsylvania over Indiana.

[12]  In *Specialty Surfaces*, an insured corporation and its subsidiary, both with principal places of business in Pennsylvania, were sued in California for services the subsidiary performed in California. 609 F.3d at 227.  The court of appeals affirmed the district court's decision that Pennsylvania law, not California law, applied.  *Id.* at 237.

definition of pollutant in a vacuum, and routinely find substances not expressly included in the provision to be pollutants. *See, e.g.*, *Madison*, 735 A.2d at 107 (finding fumes from concrete treatment to be a pollutant, and explaining "[t]he pertinent inquiry is not, as Madison contends, whether the policy's definition of 'pollutant' is so broad that virtually any substance . . . could be said to come within its ambit. Rather, guided by the principle that ambiguity (or the lack thereof) is to be determined by reference to a particular set of facts, we focus on the specific product at issue"); *Matcon Diamond*, 815 A.2d at 1115 (finding carbon monoxide to be a pollutant). Thus, as the conflict here is simply one of differing interpretative approaches, the mere fact Travelers and Zurich would have to defend the underlying suit in Indiana does not tip the balance otherwise weighing heavily in favor of Pennsylvania.

The Clemens Defendants also argue Indiana has a public policy in favor of protecting farmers from nuisance suits, but this argument is unpersuasive. First, protecting farmers is not an interest underlying Indiana courts' construction of pollution exclusions. Second, while this interest may be relevant to whether Indiana tort law should apply, the applicable choice of law rule makes clear that when analyzing a state's contacts with an insurance contract, the focus is on the insurance policy, and not the underlying tort. *See Specialty Surfaces*, 609 F.3d at 236 (citing *McCabe*, 514 A.2d at 586); *Hammersmith*, 480 F.3d at 235 (same). Moreover, the Clemens Defendants' desired result of interpreting the Travelers and Zurich Policies under the law of the state in which the underlying action is brought runs contrary to the favored approach "that only one set of laws govern a given insurance contract." *Hammersmith*, 480 F.3d at 235 n.14.

Although Indiana has an interest in ensuring its residents enjoy adequate defense and compensation in tort actions, Pennsylvania's interest in regulating insurance contracts made in

14

Pennsylvania, and issued to Pennsylvania corporations that transact all of their business from their Pennsylvania headquarters "is paramount." *Id.* at 235. Therefore, because Pennsylvania has the most significant relationship with the insurance contracts at issue, and the greatest government interest in seeing its laws enforced, this Court will apply Pennsylvania law to the issue of whether Travelers and Zurich have a duty to defend and indemnify the Clemens Defendants in the Cook Action.

Under Pennsylvania law, interpretation of an insurance contract is "generally performed by a court rather than by a jury." *401 Fourth St., Inc. v. Investors Ins. Grp.*, 879 A.2d 166, 171 (Pa. 2005) (quotation omitted). The court's task is "to ascertain the intent of the parties as manifested by the terms used in the written insurance policy." *Id.* "The court must give effect to any language of the policy which is clear and unambiguous." *NorFab Corp. v. Travelers Indem. Co.*, 555 F. Supp. 2d 505, 509 (E.D. Pa. 2008) (citing *401 Fourth St.*, 879 A.2d at 171). If a policy provision is ambiguous, however, it should be construed in favor of the insured "to further the contract's prime purpose of indemnification." *401 Fourth St.*, 879 A.2d at 171. "Contractual language is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense," *Madison*, 735 A.2d at 106 (quotation omitted), but a court should not "distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity." *Id.* Individual terms in a policy provision should be considered in the context of the whole provision. *401 Fourth St.*, 879 A.2d at 171.

In deciding whether Travelers and Zurich have a duty to defend the Clemens Defendants in the Cook Action, this Court must "compare the coverage afforded under the polic[ies] with the

factual allegations contained within the four corners of the complaint."[13] *NorFab Corp.*, 555 F. Supp. 2d at 509 (citing *Mut. Benefit Ins. Co. v. Haver*, 725 A.2d 743, 745 (Pa. 1999)).  A duty to defend "arises whenever an underlying complaint may 'potentially' come within the insurance coverage." *Frog, Switch & Mfg. Co. v. Travelers Ins. Co.*, 193 F.3d 742, 746 (3d Cir. 1999) (citing *Erie Ins. Exch. v. Claypoole*, 673 A.2d 348, 355 (Pa. Super. Ct. 1996)).  "[I]f a single claim in a multiclaim lawsuit is potentially covered, the insurer must defend all claims until there is no possibility that the underlying plaintiff could recover on a covered claim." *Id.* at 746 (citing *Erie Ins. Exch. v. Transamerica Ins. Co.*, 533 A.2d 1363, 1368 (Pa. 1987)).  Travelers and Zurich bear the burden of proving coverage is excluded under their respective policies.  *See Madison*, 735 A.2d at 106.

The "polestar" of the inquiry into whether the Travelers and Zurich Policies' pollution exclusions apply "is the language of the insurance policy." *Id.*  The Travelers and Zurich pollution exclusions are essentially identical and state coverage does not extend to bodily injury or property damage caused by the insured's "actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants.'"  Travelers Policy, at CFC025; Zurich Policy.  The parties do not dispute the complaint in the Cook Action alleges the plaintiffs suffered and continue to suffer bodily injury and property damage—as these terms are defined in the policies—caused by the sow production facility's discharge or release of foul and noxious odors emitted from the pig excrement the facility collects and spreads on the surrounding land.  The Clemens Defendants,

---

[13]  Travelers and Zurich also seek declarations they do not owe a duty to indemnify the Clemens Defendants.  The duty to defend is broader than the duty to indemnify; therefore, if the insurers are found to not have a duty to defend the Clemens Defendants, they also will not have a duty to indemnify them.  *See Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 896 (Pa. 2006).

however, argue the noxious odors are not a pollutant as that term is defined in the policies.  The Court therefore must determine "whether the polic[ies'] definition of 'pollutant' applies unambiguously to" the noxious odors identified in the Cook Complaint.  *Madison*, 735 A.2d at 107.

The Travelers and the Zurich Policies each define the term pollutant as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed." Travelers Policy, at CFC0153; Zurich Policy.  Whether odors emitted from a large livestock facility, such as those alleged in the Cook Complaint, constitute a pollutant as defined in the policies has not yet been addressed by a court applying Pennsylvania law, although several Pennsylvania decisions have examined the applicability of pollution exclusions virtually identical to those at issue here, utilizing virtually identical definitions of pollutant.  *See, e.g.*, *Madison*, 735 A.2d at 102-103; *Wagner*, 801 A.2d at 1229; *Matcon Diamond*, 815 A.2d at 111; *Municipality of Mt. Lebanon v. Reliance Ins. Co.*, 778 A.2d 1228, 1233 (Pa. Super. Ct. 2001); *Mark I Restoration SVC v. Assurance Co. of Am.*, 248 F. Supp. 2d 297, 400 (E.D. Pa. 2003).

Pennsylvania courts frequently look to dictionary definitions in analyzing whether a substance is a pollutant under a pollution exclusion.  *See, e.g.*, *Madison*, 735 A.2d at 108; *Matcon Diamond*, 815 A.2d at 1113.  Pennsylvania courts have relied on the following dictionary definitions for the two key terms used to define pollutant in the Travelers and Zurich Policies:  an "irritant" is "a biological, chemical, or physical agent that stimulates a characteristic function or elicits a response, especially an inflammatory response"; and a "contaminant" is "something which renders another thing impure or unsuitable by contact or mixture."  *Matcon Diamond*, 815 A.2d at 1113 (quoting *Mt. Lebanon*, 778 A.2d at 1233 (adopting dictionary definitions)) (alterations omitted).  The

17

policies also provide the following non-exhaustive list of possible pollutants: "smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste," and state "[w]aste includes materials to be recycled, reconditioned or reclaimed." One dictionary definition of "waste" is "damaged, defective, or superfluous material produced during or left over from a manufacturing process or industrial operation: material not usable for the ordinary or main purpose of manufacture"; another is "refuse from places of human or animal habitation" such as "garbage . . . excrement . . . [or] sewage." *Merriam-Webster's Third New Int'l Dictionary Unabridged*, http://www.mwu.eb.com/mwu (last visited Mar. 29, 2012). "Fume" is defined as "a gaseous emission (as from a burning or evaporating substance) that is usually odorous and sometimes noxious," such as "smoke . . . vapor . . . [or] odor," and as "an often noxious suspension of particles in air or gas that may be formed in various ways (as by condensation of vapors or by chemical reaction)." *Id.*

Considering the foregoing, noxious odors produced by pig excrement (or waste) that cause bodily injury and property damage appear to fit squarely within the definition of pollutant under the policies. The fact the pig waste is spread over fields as fertilizer is of no moment, as "waste" includes materials left over from a production operation, and the policies' definition of pollutant expressly includes waste that is to be reused. Several Pennsylvania cases have held allegedly noxious fumes constitute a pollutant triggering the pollution exclusion. *See Madison*, 735 A.2d at 107 (holding fumes from a cement curing agent that caused worker to lose consciousness was pollutant triggering pollution exclusion); *Matcon Diamond*, 815 A.2d at 1113-14 (holding carbon monoxide fumes emitted from a gas-powered saw that overcame worker was pollutant triggering pollution exclusion); *Mark I Restoration*, 248 F. Supp. 2d at 404-05 (holding vaguely described "chemicals, deodorizers, odor eliminators, and/or other foreign substances" used to clean a house

which caused physical injury to homeowner were pollutants triggering pollution exclusion), *aff'd*,

112 F. App'x 153 (3d Cir. 2004); *U.S. Fid. & Guar. Co. v. Korman Corp.*, 693 F. Supp. 253, 259-60

(E.D. Pa. 1988) (holding smoke, noxious odors, and gases from landfill, along with leeching and

groundwater contamination, that allegedly caused property and bodily damage, triggered pollution

exclusion); *see also Devcon Int'l Corp. v. Reliance Ins. Co.*, 609 F.3d 214, 219-20 (3d Cir. 2010)

(holding particulate dust generated at construction site causing respiratory irritation and groundwater

contamination was pollutant triggering pollution exclusion in case applying Virgin Islands law, but

citing Pennsylvania contract law as persuasive authority).

The Clemens Defendants nevertheless contend simple odors cannot be pollutants. They

argue because odors can be unpleasant or sweet, harmful or innocuous, the allegation of foul odors

is too ambiguous to be construed as a pollutant barring coverage. Ambiguity, however, "is not a

question to be resolved in a vacuum. Rather, contractual terms are ambiguous if they are subject to

more than one reasonable interpretation *when applied to a particular set of facts*." *Madison*, 735

A.2d at 106 (emphasis added). Courts, therefore, must focus on the "specific product at issue in

relation to the events giving rise to [the insured's] claim." *Wagner*, 801 A.2d at 1232 (quotation and

alterations omitted). Thus, the nature of the odors must be examined in relation to the claims alleged

in the Cook Complaint. *See Mark I Restoration*, 248 F. Supp. 2d at 403-04 (examining whether

substance is pollutant not in a vacuum, but in context of the facts and claims alleged in the

underlying complaint).

The odors described in the underlying suit are not alleged to have been merely unpleasant,

but are alleged to have been so noxious they caused the plaintiffs to experience nausea, vomiting,

headaches, breathing difficulties, and irritated eyes, among other physical ailments. The Complaint

also alleges the odors, contaminated wastewater, and other hazardous substances have escaped onto the plaintiffs' properties impairing their use and enjoyment of the properties.  In other words, the pig waste and odors are alleged to have caused inflammatory, physiological responses in the plaintiffs and rendered the air at the plaintiffs' homes unsuitable.

Significantly, the Cook Complaint asserts more than simply manure smell from a pig farm drifted onto the plaintiffs' property.  Rather, it alleges the sow facility's "waste management practices"—collecting the pig excrement in a deep cement pit and periodically spreading it over surrounding fields in a negligent manner such that the excrement is not incorporated into the soil—and the manner in which it composts its dead pigs, produced sickening odors.  Cook Compl., at 3.  Viewed in relation to these specific factual claims that the sow facility was creating pollution which physically harmed the plaintiffs, the noxious odors fit unambiguously within the definition of pollutant in the Travelers and Zurich Policies.

The Clemens Defendants also argue simple farm odors cannot be pollutants in a rural setting where such odors are commonplace.  They further argue Travelers and Zurich have failed to provide any evidence the odors contain a specific harmful or hazardous substance, or a substance regulated by environmental laws.  However, a pollutant does not cease being a pollutant simply because it is common to an area.  Furthermore, there is no requirement a pollutant must be expressly described as containing a documented hazardous substance to trigger a pollution exclusion.  *See Mark I Restoration*, 248 F. Supp. 2d at 404-05 (holding "chemicals, deodorizers, odor eliminators, and/or other foreign substances" were pollutants triggering pollution exclusion), *aff'd*, 112 F. App'x at 157 ("Although the terms 'chemicals, deodorizers, odor eliminators, and/or other foreign substances,' are conceptually quite broad and certainly may, in theory, include benign substances rather than

'pollutants,' the specific nature of the claim alleged against Mark I prevents this court from engaging in such untethered speculation.  Rather, as used in the third party complaint, the terms 'chemicals, deodorizers, odor eliminators, and/or other foreign substances' unambiguously refer to the 'irritant[s] or contaminant[s]' described as 'pollutants' in the policy.").  In fact, courts in other jurisdictions examining nearly identical definitions of pollutant regularly hold noxious odors fall within the definition, including, in at least one case, odors from a pig farm.[14]  *See Wakefield Pork, Inc. v. Ram Mut. Ins. Co.*, 731 N.W.2d 154, 157, 161 (Minn. Ct. App. 2007) (holding a pig farm's "extremely noxious and offensive odors and gases that caused and/or exacerbated [plaintiffs'] health problems, diminished their quality of life, curtailed their use and enjoyment of their property, and caused a decrease in the market value of their property" fell within the plain meaning of pollutant triggering the pollution exclusion); *see also, e.g.*, *City of Spokane v. United Nat'l Ins. Co.*, 190 F. Supp. 2d 1209, 1221 (E.D. Wash. 2002) (holding odors from a composting facility were pollutants triggering pollution exclusion); *Kruger Commodities, Inc. v. U.S. Fid. & Guar.*, 923 F. Supp. 1474 (M.D. Ala. 1996) (holding "offensive odors" emitted from plant that rendered animal carcasses were pollutants triggering pollution exclusion, even absent evidence the odors contained a toxic chemical or the plant was in violation of environmental laws); *City of Bremerton v. Harbor Ins. Co.*, 963 P.2d 194, 197-198 (Wash. Ct. App. 1998) (holding "foul and obnoxious odors and toxic gases" emitted from sewage treatment plant were unambiguously pollutants triggering the pollution exclusion, despite deletion of "waste" from the definition of pollutant).

Although a substance is not required to be regulated by an environmental law to constitute

---

[14] As demonstrated in *American & Foreign Insurance Co. v. Jerry's Sport Center, Inc.*, 2 A.3d 526, 539 (Pa. 2010), Pennsylvania courts will look to case law from other states in addressing insurance coverage issues.

a pollutant under the Travelers and Zurich Policies, this Court recognizes large livestock feeding operations, because of the amount of animal excrement they produce, are regulated through the Clean Water Act. *See generally* National Pollutant Discharge Elimination System Permit Regulation and Effluent Limitation Guidelines and Standards for Concentrated Animal Feeding Operations (CAFOs), 68 Fed. Reg. 7176-01 (Feb. 12, 2003) (summarizing purpose and rationale of regulation and noting "[l]ivestock and poultry manure, if not properly handled and managed by the CAFO, can contribute pollutants to the environment and pose a risk to human and ecological health," and "[p]ollutants most commonly associated with animal waste include nutrients (including ammonia), organic matter, solids, pathogens, and odorous compounds"). As Travelers and Zurich note, moreover, the underlying Complaint alleges "[t]he sewage in the deep pit contains levels of nitrate, hydrogen sulfide, ammonia, sulfate, afterbirth remnants and other hazardous substances." Cook Compl., at 6.

For the foregoing reasons, this Court finds the Travelers and Zurich Policies' pollution exclusions unambiguously apply to the claims against the Clemens Defendants in the Cook Action. Therefore, Travelers and Zurich do not have a duty to defend the Clemens Defendants in the Cook Action, and accordingly do not have a duty to indemnify them for any damages resulting therefrom. *See Kvaerner*, 908 A.2d at 896 (holding insurer who owes no duty to defend insured necessarily owes no duty to indemnify). Accordingly, this Court will grant summary judgment to Travelers and Zurich on their claims for declaratory judgment against the Clemens Defendants.

An appropriate order follows.

BY THE COURT:


\s\  Juan R. Sánchez
Juan R. Sánchez, J.